UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

United States of America,

                                        CR-03-910 (CPS)

        - against -                     MEMORANDUM
                                        OPINION AND ORDER
Julian Hall,

                Defendant.

----------------------------------------X

SIFTON, Senior Judge.

        Julian Hall was first indicted in August 2003, and charged
with conspiring to distribute cocaine base and marijuana in
violation of 21 U.S.C. § 846.  The latest superseding indictment
charges Hall with the following offenses: (1) conspiring to
distribute cocaine base and marijuana in violation of 21 U.S.C. §
846 and 21 U.S.C. § 841(a)(1); (2) two counts of distributing and
possessing with intent to distribute marijuana in violation of 21
U.S.C. § 841(a)(1); (3) three counts of using a firearm during
and in relation to a drug trafficking offense in violation of 18
U.S.C. § 924(c); (4) causing the death of Darnell Myers through
use of a firearm in violation of 18 U.S.C. § 924(j)(1); (5) the
drug-related murder of Darnell Myers in violation of 21 U.S.C. §
848(e)(1)(A); (6) two counts of firearms trafficking in violation
of 18 U.S.C. § 922(a)(3); (7) one count of cocaine base
distribution in violation of 21 U.S.C. § 841(a)(1); and (8) one
count of cocaine base distribution near a playground in violation

of 21 U.S.C. §§ 841 & 860.

Presently before the Court are Hall's motions to suppress
marijuana seized from a car in which he was traveling when he was
arrested on the grounds that it was obtained in violation of the
Fourth Amendment, and to suppress post-arrest statements, on the
grounds that they were obtained in violation of the Fifth and
Sixth Amendments and the Vienna Convention on Consular Relations.
A hearing was held in connection with these motions during which
F.B.I. Agent Jed Salter testified.  For the reasons and upon the
factual findings and legal conclusions that follow, both motions
are denied.

<u>Background</u>

The following facts are drawn from the testimony at the
suppression hearing, a declaration by Julian Hall, and the
exhibits submitted in connection with these motions.  Disputes
are noted.

On August 8, 2003, Hall was charged in an indictment with
conspiring to distribute cocaine base and marijuana.  A warrant
was issued for Hall's arrest in connection with these charges.
At the time of his arrest, Hall was residing in North Carolina.
At the suppression hearing, F.B.I. Agent Jed Salter testified
that at the time of the arrest, he was working in conjunction
with North Carolina police to apprehend Hall.  He provided them
with an arrest warrant, photographs, and Hall's pedigree
information.

Salter testified that Hall was apprehended as a result of a

tip by a friend of Hall, named Melissa. On February 22, 2004, Melissa phoned Salter and stated that she would be driving in her car with Hall and that the car contained marijuana. She provided Salter with their location, and Salter relayed this information to the local North Carolina police. Hall was arrested while riding in Melissa's automobile later that day. During the arrest, the police searched the car and recovered marijuana.

Agent Salter testified that Hall was first interviewed following his arrest on February 23, 2004, by F.B.I. Special Agent Rambaud. During that interview, Hall signed an "Advice of Rights" form that informed Hall that he had the right to remain silent and to have an attorney appointed and present during questioning. According to Rambaud's report, Hall told him that he had purchased the marijuana from an unidentified male in Goldsboro, North Carolina and that he had sold a few ounces of marijuana since arriving in North Carolina.

On February 24, 2004, Hall was taken before a magistrate judge in the Eastern District of North Carolina and informed that there was a federal warrant for his arrest. The magistrate judge advised Hall of his constitutional rights, including his right to remain silent and that a new attorney would be appointed to represent him upon his transfer to Brooklyn. Hall's North Carolina attorney informed the court that Hall was a citizen of Guyana. The Court informed Hall of his right under the Vienna Convention to have the Guyanese Consulate notified and asked him if he would like that done. Hall said that he would. The

Government acknowledged that it was responsible for notifying the consulate and that it would see that it happened. The Government has since conceded that this notification did not occur.

On February 27, 2004, Salter interviewed Hall concerning the murder of Darnell Myers, an offense for which Hall had not yet been indicted. During that interview, Hall confessed to the murder. Hall states that he was not advised of his constitutional rights until after he had confessed. According to Hall, Salter said, "Okay, you want to play hard ball, we have something for you," that Hall would be "locked away for a long time," and that Hall would not see his children because he would be placed in a prison far away "like in Alaska." If, however, Hall would "make a deal," Salter would "write a letter to the judge." Hall states that he understood this to mean that the judge would be lenient. Hall then told Salter that he had killed Myers. It was only at that point, according to Hall, that Salter produced a form for Hall to sign that informed him of his constitutional rights.

Salter's testimony concerning the interview was quite different. Salter testified that the interview began shortly after noon. Salter introduced himself and explained that he was investigating events occurring around the Marcus Garvey Village in Brooklyn. Salter testified that he then provided Hall with an "Advice of Rights" form. Hall proceeded to read the form carefully and sign it. The advice of rights form that Salter testified that Hall signed states that the interview began at

12:18 p.m. and that Hall signed the form, six minutes later, at
12:24 p.m. According to Salter, it was only after that time that
Hall was questioned or made any incriminating statements.

Hall was subsequently charged in an indictment with causing
the death of Darnell Myers through use of a firearm in violation
of 18 U.S.C. § 924(j)(1) and a drug-related murder in violation
of 21 U.S.C. § 848(e)(1)(A).

Discussion

Suppression of Marijuana

Hall moves to suppress the marijuana seized during the
search of the car he was riding in when arrested. Hall states
that he did not consent to the search, and the search was
conducted prior to the arrival of police dogs. Hall states that
the marijuana was found in a box in the backseat. The Government
challenges Hall's standing to seek suppression of the marijuana
seized from the car because he has not claimed that the marijuana
was his and because he did not have a reasonable expectation of
privacy in the car.

For evidence to be suppressed, it is not sufficient for a
criminal defendant to merely claim prejudice from the
introduction of evidence seized in violation of the Fourth
Amendment. The defendant must himself have been a victim of the
illegal search. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978);
*United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002); *see
generally* 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 9.1(a). For
the defendant to be a "victim" of the illegal search, it must

have intruded on his own reasonable expectation of privacy. *See Rakas*, 439 U.S. at 143 ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claim the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). The defendant bears the burden of proving that he had a legitimate expectation of privacy. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

In *Rakas* the Supreme Court held that a car passenger could not assert the protection of the Fourth Amendment against the seizure of evidence he did not own from a car in which he was merely a passenger. *Id.* at 139-40; *see also Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998) (discussing *Rakas*); 3 LAFAVE, *supra* at § 9.1(d) (discussing whether passengers have standing to move to suppress evidence seized during a search of the car).

The Supreme Court extended *Rakas* in *Rawlings v. Kentucky*, 448 U.S. 98 (1980). In *Rawlings*, the Court held that even where the defendant owned the property seized, he must demonstrate a reasonable expectation of privacy in the location searched. *Id.* at 105-06. Because he was merely passenger in Melissa's vehicle, Hall has not established that any expectation of privacy that he may have had was reasonable. *See United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005); *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988).

But even assuming that Hall's privacy interests were invaded by the search, the search did not violate the Fourth Amendment because it was incident to a lawful arrest. In *New York v.*

*Belton*, 453 U.S. 454 (1981), the Supreme Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. The police may also examine the contents of any containers found within the passenger compartment within reach of the arrestee. *Id.* at 460.

The car was in any event properly searched because Melissa, the informant, told Salter that the car contained marijuana, which provided probable cause to search. *See California v. Acevedo*, 500 U.S. 565, 579-80 (1991); *Colorado v. Bannister*, 449 U.S. 1, 3 (1980) (applying the "automobile exception" to the warrant requirement); 2 LaFave, *supra* at § 3.7(b).


Suppression of the Confession

Hall contends that his confession must be excluded because it was obtained in violation of his rights under the Fifth and Sixth Amendments, and the Vienna Convention on Consular Relations.

Fifth Amendment

The Fifth Amendment guarantees the right to have counsel present during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436 (1966). Under *Miranda,* the accused must be adequately informed of this right prior to custodial interrogation, and the right must be waived. *Id.* at 467. A violation requires suppression. *Id.* The right to counsel guaranteed by the Fifth

Amendment may, however, be waived. *Moran v. Burbine*, 475 U.S.
412 (1986). The Government bears the burden of proving a knowing
and voluntary waiver. *Missouri v. Seibert*, 124 S.Ct. 2601, 2608
n.1 (2004).

I find that the Government has met that burden. Agent
Salter credibly testified in a coherent, consistent, and detailed
manner that Hall was presented with and signed the advice of
rights form prior to any questioning. The forms submitted
clearly state the relevant *Miranda* warnings, and Salter credibly
testified that Hall read them thoroughly. In contrast, Hall did
not testify, and submitted only a signed declaration. He did not
submit to cross-examination or permit the Court to assess his
credibility under questioning.[1] I credit Salter's testimony,
reject Halls' affidavit, and conclude that Hall was presented
with and signed the advice of rights forms prior to being
questioned. The Government has therefore sustained its burden of
proving that Hall waived his Fifth Amendment rights prior to
questioning.

Sixth Amendment

The Sixth Amendment also guarantees the right to the

---

[1] I draw no adverse inference from Hall's decision not to take
the stand. I merely note that his failure to do so has left the Court
with little evidence supporting his version of events. *Cf. United
States v. Mullens,* 536 F.2d 997, 1000 (2d Cir. 1976) ("[The defendant]
chose not to take the stand during the suppression hearing and rebut
the version of events although he might have done so without risk that
anything he said could later be used against him at trial."). Because
the Court has determined that Salter's testimony is credible, based in
part on his demeanor on the stand, his testimony is simply more
persuasive.

assistance of counsel.  This includes the right to have counsel present at post-arraignment, custodial interrogations.  *Michigan v. Jackson*, 475 U.S. 625, 629 (1986).  Unlike the Fifth Amendment right, however, the Sixth Amendment right is "offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  Once the right has attached and been invoked with respect to a specific offense, the police may not initiate questioning outside the presence of the defendant's attorney.  *Jackson*, 475 U.S. at 635.  The transcript of the hearing held in North Carolina reveals that Hall requested that counsel be appointed and that counsel was appointed pursuant to his request.  Under *Michigan v. Jackson*, Hall could not be questioned outside the presence of his lawyer with respect to the drug conspiracy charges contained in the August 8, 2003 indictment in this district.  *See Jackson,* 475 U.S. at 634 (defendant may invoke right at arraignment; thereafter he cannot be questioned regarding that offense outside the presence of counsel).

Nevertheless, Hall was questioned outside the presence of his attorney on February 27, 2005.  He contends that the Sixth Amendment requires that his confession be suppressed because (1) his Sixth Amendment rights with respect to the murder attached by virtue of his indictment for drug conspiracy; and (2) the murder confession was obtained only as a result of prior questioning concerning the drug conspiracy charges in violation of the Sixth Amendment, and should be suppressed as a fruit of a poisonous tree.

Whether the Sixth Amendment Right to Counsel Had

"Attached" to the Murder Charges

Hall contends that his Sixth Amendment rights had attached with respect to the murder-related charges as a result of his being charged in an indictment with conspiring to distribute cocaine base and marijuana.  Because, he argues, his Sixth Amendment right with respect to the charges in the indictment had attached and been invoked, his written waiver was ineffective. *Jackson*, 475 U.S. at 635.  The Sixth Amendment is, however, as noted, offense specific.  *McNeil*, 501 U.S. 171.  Being charged in an indictment of committing one offense does not foreclose questioning on a different offense.  *Id.* at 175.

Application of this rule, in this case, requires a determination whether violations of two different statutory provisions are, in reality, the "same offense."  The Supreme Court has recently held that the appropriate test for Sixth Amendment purposes is the same as that applied for double jeopardy purposes, originally announced in *Blockburger v. United States,* 284 U.S. 299 (1932).  *Texas v. Cobb*, 532 U.S. 162, 173 (2001).  *Blockburger* sets forth a two-part test.  First, for the two offenses to be different, each offense must require proof of an element that the other does not.  This step focuses on the statutory elements of the offenses, not the actual evidence to be introduced at trial with respect to each offense.  *Illinois v. Vitale,* 447 U.S. 410, 416 (1980).  Secondly, even if the elements of the two offenses are the same, the offenses are not the same

- 11 -

if Congress intended that the two statutory provisions provide
for cumulative punishments. *See Missouri v. Hunter*, 459 U.S. 359
(1983); *see United States v. Johnson*, 352 F.3d 339 (8th Cir.
2003) (applying the "legislative intent" step to the Sixth
Amendment version of the *Blockburger* test).

### *Blockburger/Cobb* Step One

The first step of the *Blockburger/Cobb* test requires
considering whether "each [statutory] provision requires proof of
a fact that the other does not." *Cobb*, 532 U.S. at 173. At the
time, Hall had been charged with conspiring to possess with
intent to distribute cocaine base and marijuana in violation of
21 U.S.C. § 846. The issue is therefore whether the controlled
substances conspiracy alleged in the first indictment requires
proof of an element that the subsequent charges alleging drug-
related murder in violation of 21 U.S.C. § 848(e)(1)(A) or
causing death by use of a firearm during a drug-trafficking crime
or crime of violence in violation of 18 U.S.C. § 924(j) do not,
and vice versa.

At the time of the interview, Hall had been charged with
violating 18 U.S.C. § 846, which provides:

> Any person who attempts or conspires to commit any offense
> defined in this subchapter shall be subject to the same
> penalties as those prescribed for the offense, the
> commission of which was the object of the attempt or
> conspiracy.

The statute that the indictment accuses Hall of conspiring to
violate is 21 U.S.C. § 841(a)(1), which provides:

> [I]t shall be unlawful for any person knowingly or

intentionally–
(1) to manufacture, distribute, or dispense, or possess with
intent to manufacture, distribute or dispense, a controlled
substance

The relevant murder-related charges in the indictment allege

violations of two statutes: 21 U.S.C. § 848(e)(1) and 18 U.S.C. §

924(j). 21 U.S.C. § 848(e)(1) provides in relevant part:

(1) In addition to the other penalties set forth in this
section --
    (A) any person engaging in or working in furtherance
    of a continuing criminal enterprise, or any person
    engaging in an offense punishable under 841(b)(1)(A)
    of this title or section 960(b)(1) of this title who
    intentionally kills or counsels, commands, induces,
    procures, or causes the intentional killing of an
    individual and such killing results, shall be
    sentenced to any term of imprisonment, which shall not
    be less than 20 years, and which may be up to life
    imprisonment, or may be sentenced to death

And 18 U.S.C. § 924(j) provides in relevant part:

A person who, in the course of a violation of subsection
(c), causes the death of a person through the use of a
firearm, shall–
    (1) if the killing is murder (as defined in section
    1111), be punished by death or by imprisonment for any
    term of years or for life; and
    (2) if the killing is manslaughter (as defined in
    section 1112), be punished as provided in that
    section.

18 U.S.C. § 924(j) refers to the predicate offense defined in 18

U.S.C. § 924(c), which provides:

Except to the extent that a greater minimum sentence is
otherwise provided by this subsection or by any other
provision of law, any person who, during and in relation to
any crime of violence or drug trafficking crime (including a
crime of violence or drug trafficking crime that provides
for an enhanced punishment if committed by the use of a
deadly or dangerous weapon or device) for which the person
may be prosecuted in a court of the United States, uses or
carries a firearm, or who, in furtherance of any such crime,
possesses a firearm, shall, in addition to the punishment
provided for such crime of violence or drug trafficking

crime –
     (i) be sentenced to a term of imprisonment of not less than 5 years;
     (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
     (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

An examination of these murder-related offenses reveals that they both require proof of either a predicate violent or drug-trafficking crime or that the offense be in furtherance of a predicate drug trafficking crime or continuing criminal enterprise. Conviction on both of the murder-related charges therefore requires proof of a predicate offense.[2]

Predicate offenses complicate the *Blockburger/Cobb* analysis,[3] but Supreme Court precedent reveals that predicate

---

[2] The Government contends that conviction on the conspiracy charge requires proof that the defendant entered into an agreement, which is not a prerequisite for conviction for violating either 21 U.S.C. § 848(e)(1)(A) or 18 U.S.C. § 924(j). According to the Government, a conviction on the two new offenses requires proof of either a murder or use of a firearm, which is not an element of the original charge of conspiring to distribute a controlled substance. One of the elements, however, of a conviction under both § 848(e) and § 924(j) is proof of a predicate offense. Neither Hall nor the Government address the fact that the drug trafficking conspiracy was a predicate offense for the murder-related charges.

[3] *See Whalen v. United States*, 445 U.S. 684, 709 (1980) (Rehnquist, J., dissenting) (noting difficulty in applying first part of *Blockburger* test to predicate offenses); *United States v. Allen*, 247 F.3d 741, 767-68 (8th Cir. 2001) ("It is not exactly clear how predicate offenses are to be treated for purposes of *Blockburger*."); *United States v. Quinones*, 906 F.2d 924, 926 (2d Cir. 1990) (in dictum, noting that conviction on underlying drug offense does not require proof of facts different than those necessary for conviction for using firearm in furtherance of a drug trafficking crime); Anne Bouwen Poulin, *Double Jeopardy Protection From Successive Prosecution*, 92 GEO. L.J. 1183, 1274 (2004); Howard W. Anderson III, Note, *Determining When Two Offenses are the Same Under Indiana's Criminal Rule* 4, 80 IND. L.J. 825, 846 n.153 (2005) (noting the difficulty in applying the *Blockburger* test to "complex crimes" involving predicate

(continued...)

offenses cannot be considered to contain an element that the
greater offense does not.  In *Whalen v. United States*, 445 U.S.
684 (1980), the Court considered whether rape and a felony murder
during the course of a rape are separate offenses.  The
Government contended that they were separate offenses because,
although rape could constitute the predicate felony for felony
murder, other felonies would also suffice.  The Court rejected
the argument because, in the context of Whalen's prosecution, the
Government had sought to prove that the rape in question was the
predicate offense.  *Whalen*, 445 U.S. at 694.

The Supreme Court again stated that predicate offenses are
the same as the "greater" offense of which their commission is an
element in *Garrett v. United States*, 471 U.S. 773 (1985).  In
*Garrett*, the prosecution sought to convict the defendant of
engaging in a "continuing criminal enterprise" in violation of 21
U.S.C. § 848.  That statute requires proof that the defendant had
previously engaged in a series of felonies.  Garrett had already
been convicted of one of the predicate felonies on which the
prosecution relied.  *Id.* at 775-76.  The Court held that,
although the predicate felony did not contain an element that was
contained in the continuing criminal enterprise charge, the two
offenses were not the same because Congress intended to impose
cumulative punishments.  *Id.* at 786.

Under *Whalen* and *Garrett*, predicate offenses which form the

---

(...continued)
offenses).

basis for greater statutory offenses always fail the first step of the *Blockburger/Cobb* test. *See United States v. Allen*, 247 F.3d 741, 768 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953. This is so because proof of the greater offense necessarily requires proof of some predicate offense. The predicate offense therefore contains no element not also contained in the greater offense.

Complicating the analysis, however, is that the greater offenses at issue in this case can be proven by establishing multiple potential predicate offenses, including crimes of violence, drug trafficking crimes, or an underlying continuing criminal enterprise. The Government in this case has taken conflicting positions concerning which of several controlled substance offenses it seeks to prove as the predicate offense for the murder charges. The first superseding indictment[4] that alleged murder-related charges, filed on August 7, 2004, accused Hall of murdering Darnell Myers while engaging in the conspiracy offense alleged in the first indictment. This allegation was repeated in superseding indictments filed on October 15, 2004, January 21, 2005, March 4, 2005, and April 1, 2005. As noted, under *Blockburger/Cobb*, those offenses are the same. It was not

_____

[4] The law is not clear to what extent the Court may look to the underlying indictment in applying the *Blockburger* test. *Compare United States v. Chacko*, 169 F.3d 140, 146-47 (2d Cir. 1999) (rejecting argument that "it is appropriate to examine the specifics of the indictment and the nature of the counts charged" in applying *Blockburger*), *with Allen*, 247 F.3d at 768 ("[T]he Supreme Court has applied *Blockburger* by considering the nature of the underlying felony in a felony-murder indictment rather than based on the elements of the statute at issue.) (citing *Whalen*, 445 U.S. at 694-95).

until Hall filed a motion to suppress the confession that the
Government filed a final superseding indictment on May 26, 2005,
alleging that the murder was committed, not while Hall was
engaged in the controlled substances conspiracy, but instead
while he engaged in a newly alleged substantive marijuana
possession and distribution offense.[5]

The Court need not, however, resolve the difficult
application of the first step of the Blockburger/Cobb analysis,
because it is clear that Congress intended that the relevant
statutes provide cumulative punishments.  Accordingly, as
discussed below, they are not the same offense.

### *Blockburger/Cobb* Step Two: Congressional Intent

Even if two offenses do not each contain an element missing
in the other, they are not the "same offense" under the
cumulative punishment version of the *Blockburger* test if Congress
has expressly authorized cumulative punishments for their
violations.

As noted § 848(e)(1) prohibits murder while engaging in
either a continuing criminal enterprise or a drug trafficking
offense.  The statute also states that its punishments for murder
are "in addition to the other penalties set forth in this

---

[5] Conspiracy to distribute and actual distribution are two
distinct offenses under *Blockburger/Cobb.*  The conspiracy charge
requires proof of an agreement, but does not require proof of actual
possession.  The possession charge requires proof of actual
possession, but does not require proof of an agreement.

section."  This "in addition to" language makes clear that
Congress intended to impose cumulative punishments under §
848(e)(1), at least cumulative with any sentences for engaging in
a continuing criminal enterprise as prohibited by § 848.  *United
States v. Honken*, 271 F. Supp. 2d 1097, 1110-11 (N.D. Iowa 2003).
But it is less clear whether Congress intended cumulative
punishment for murder while engaging in "an offense punishable
under section 841(b)(1)(A)" -- a different statutory section.
Nevertheless, courts have uniformly held that where the predicate
offense for a § 848(e) murder is a drug conspiracy, the penalties
for the two offenses are cumulative.  *United States v. Collazo-
Aponte*, 216 F.3d 163, 200 (1st Cir. 2000), *vacated on other
grounds* 532 U.S. 1036; *United States v. McCullah*, 76 F.3d 1087,
1105 (10th Cir. 1996); *United States v. NJB*, 104 F.3d 630, 634
(4th Cir. 1997); *Honken*, 271 F. Supp. 2d at 1111.  Courts have
reasoned that

> [i]t would be absurd to read the language of the statute as
> authorizing cumulative punishment for [continuing criminal
> enterprise] murder, in relation to a [continuing criminal
> enterprise] predicate offense under § 848, but not to
> authorize cumulative punishment for conspiracy murder, also
> defined in § 848(e)(1)(A), in relation to a drug conspiracy
> predicate offense.

*Honken*, 271 F. Supp. 2d at 1111.  Consistent with these cases, I
conclude that Congress intended to impose cumulative punishments
for an § 848(e) murder committed while engaging in a drug
trafficking offense and that the predicate drug trafficking
offense, and the murder are not the "same offense" for purposes
of the *Blockburger/Cobb* test.

Congress similarly authorized cumulative punishments for a violation of 18 U.S.C. § 924(j) and the predicate drug conspiracy. *Allen*, 247 F.3d at 768-69. As noted, § 924(j) provides a punishment of death or imprisonment if the defendant murders a person through use of a firearm in the course of violating § 924(c). Section 924(c) provides for an additional five year sentence if a defendant uses a firearm during a drug trafficking offense. The penalty provided by § 924(c) explicitly states that its sentence is "in addition to the punishment" for the predicate drug trafficking offense. Although § 924(j) does not contain the same "in addition to" language, courts have nonetheless held that its punishments are cumulative with those for the underlying predicate offense. First, § 924(j) incorporates § 924(c) because it requires a violation of § 924(c) for the punishments provided in § 924(j) to be applicable. *Allen*, 247 F.3d at 769. Second, "§ 924(j) is fairly interpreted as an additional aggravating punishment for the scheme already set out in § 924(c)." *Id.; see also United States v. Battle*, 289 F.3d 661, 668 (10th Cir. 2002). Because Congress has authorized cumulative punishments for a § 924(j) violation and the predicate drug conspiracy, they are not the "same offense" under *Blockburger/Cobb*.

Because neither a violation of 21 U.S.C. § 848(e) or 18 U.S.C. § 924(j) is the "same offense" as a conspiracy to violate 21 U.S.C. § 841 under the second step of the *Blockburger/Cobb* test, Hall's confession to the murder cannot be suppressed on

this ground.

<u>Fruit of the Poisonous Tree</u>

Hall's second Sixth Amendment argument, raised for the first time in his reply brief,[6] is that Salter began the February 27, 2004, interview with questions concerning the conspiracy to distribute marijuana and cocaine base. Because Hall had invoked his Sixth Amendment right with respect to that charge, such questioning was impermissible and statements consequently elicited were inadmissible. Hall contends that it was only after this impermissible questioning about the drug conspiracy that Salter proceeded to question him concerning the murder, and that his subsequent confession should be suppressed as the fruit of this poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963) (suppressing verbal evidence that came to light as the result of a Fourth Amendment violation); *United States v. Wade*, 388 U.S. 52 (1967) (applying the doctrine to Sixth Amendment). Although the Government bears the burden of proving that illegally obtained evidence is not fruit of the poisonous tree, the defendant bears the initial burden of establishing a nexus between the illegality and the challenged evidence.[7] Only after

---

[6] Suppression on this ground would be appropriately denied because the Government was deprived of an opportunity to present evidence in opposition to Hall's "fruit of the poisonous tree" argument.

[7] *See Segura v. United States*, 468 U.S. 796, 814 (1984) (holding that illegality as a but for cause of the acquisition of the evidence is a necessary, but not sufficient condition for exclusion under the fruit of the poisonous tree doctrine); *Alderman v. United States*, 394

(continued...)

the defendant has made these initial showings does the Government
bear the burden of demonstrating a sufficient break in the causal
chain to undermine the inference that the confession was caused
by the previous constitutional violation. *See United States v.
Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998) (describing
attenuation inquiry as akin to proximate causation analysis, upon
which the Government bears the burden of proof).

Because Hall's Sixth Amendment right to counsel had been
invoked with respect to the controlled substances conspiracy,
questioning Hall with respect to that charge would have violated
his Sixth Amendment rights. Nowhere in his declaration, however,
does Hall assert that Salter ever asked him any questions
concerning that charge. Nor did Salter testify that he asked
Hall any questions about that charge. (*See* Tr. 23 (testimony of
Salter that he did not tell Hall that he was there to discuss the
conspiracy).) The only evidence that Hall proffers that he was
questioned with respect to the drug conspiracy charge is Salter's
F.B.I. report made after the interview. That report states at

---

[7](...continued)
U.S. 165, 183 (1969) (defendant must come forward with specific
evidence demonstrating that evidence is tainted to be entitled to
suppression under fruit of the poisonous tree doctrine); *United States
v. Kornegay,* 410 F.3d 89, 93-94 (1st Cir. 2005) (requiring causal nexus
in Fourth Amendment context); *United States v. Pulliam*, 405 F.3d 782,
787 (9th Cir. 2005) (requiring defendant to show that evidence to be
suppressed is "in some sense the product of" the alleged
constitutional violation); *United States v. Jones*, 214 F.3d 836, 842
(7th Cir. 2000) (defendant must show that illegal conduct was connected
to subsequent confession); *United States v. Nava-Ramirez,* 210 F.3d
1128, 1131 (10th Cir. 2000); *United States v. Kandik*, 633 F.2d 1334,
1335 (9th Cir. 1980); *United States v. Torres-Castro*, 2005 WL 1554701,
-- F. Supp. 2d -- (D.N.M. Apr. 4, 2005).

one point: "HALL stated he sold marijuana in Marcus Garvey
Village and North Carolina."  Hall, in essence, asks the Court to
infer that he was questioned with regard to the controlled
substances conspiracy based on this notation in Salter's report.
But this notation is equally consistent with questioning
concerning the murder, which as Hall's confession subsequently
revealed and the indictment alleges, was closely tied to his
marijuana possession.  According to Salter's report, Hall killed
Darnell Myers because Myers had previously stolen Hall's
marijuana.  Because the notation is equally consistent with
permissible questioning about the murder as impermissible
questioning about the drug trafficking conspiracy, suppression
based on Hall's fruit of the poisonous tree argument is not
warranted.

The second obstacle to Hall's fruit of the poisonous tree
argument is, even assuming that Salter improperly questioned him
concerning the drug conspiracy, there is no causal nexus between
any statements elicited in response to such improper questioning
and Hall's subsequent confession to the murder of Darnell Myers.
The only evidence Hall offers that such a nexus exists is that he
made statements with respect to both crimes in the same
interview.  Yet Hall does not dispute that he had already
confessed to selling marijuana in a previous interview, before
his Sixth Amendment right to counsel had attached.  Hall had, in
other words, already "let the cat out of the bag" during legal
police questioning.  This factor, combined with the giving of

*Miranda* warnings, sufficiently attenuates any causal nexus between the murder confession and any alleged questioning concerning the controlled substances conspiracy. Accordingly, Brown's motion to suppress the confession on Sixth Amendment grounds must be denied.

Vienna Convention

Hall argues that his confession should be suppressed as a remedy for a violation of the Vienna Convention on Consular Relations. Article 36(1)(b) of the Vienna Convention states that the authorities of a "receiving state" shall, without delay, inform any detained foreign national of his right to have the consular post of the "sending state" notified of his detention. Article 36(1)(c) gives consular officers the right to visit and correspond with detained foreign nationals and to arrange legal representation.

The International Court of Justice recently interpreted these provisions in the case *Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. No. 128 (Mar. 31, 2004) [hereinafter "*Avena*"]. In *Avena*, the Republic of Mexico alleged a violation of the Vienna Convention with regard to several of its citizens who faced the death penalty in the United States. The I.C.J. determined that the Vienna Convention guaranteed individually enforceable rights, that the United States had violated those rights, with respect to certain Mexican nationals, and that the United States must "provide, by means of its own choosing, review and reconsideration of the convictions and

sentences of the [affected] Mexican nationals" to determine whether the violations "caused actual prejudice," without allowing procedural default to bar such review.

The Supreme Court has not addressed the issue, but has noted that the treaty "arguably confers" an individual right. *Breard v. Greene*, 523 U.S. 371, 376 (1998). The Court was again poised to interpret the Vienna Convention when it agreed to review a decision of the Fifth Circuit. That writ of certiorari was dismissed as improvidently granted on May 23, 2005, in *Meddellin v. Dretke*, 125 S.Ct. 2088 (2005).

Medellin was one of the Mexican prisoners who was a party to the *Avena* decision. After winning in the I.C.J., he sought a certificate of appealability in the Firth Circuit Court of Appeals. Despite *Avena*, the Fifth Circuit denied the motion. Medellin petitioned for certiorari, and the petition was granted. The Supreme Court thereafter vacated the grant of certiorari because four days prior to argument, Medellin filed a state petition for habeas corpus and the President of the United States issued an order to state courts "to give effect to the [*Avena*] decision in accordance with general principles of comity." The Court vacated the writ because of the possibility that the state court would provide Medellin with the relief he sought. *Id.* at 2092.

### Impact of *Avena*

Hall contends that this Court is required to follow the reasoning of *Avena* as if it were binding precedent. This is not

correct. The statute of the I.C.J. states that its decision have "no binding force except between the parties and in respect of that particular case." Statute of the International Court of Justice, Article 59. Just as I.C.J. decisions are not considered binding precedent by the I.C.J., nor are they considered authoritative statements of international law in domestic courts. *See* Reynaldo Anaya Valencia et al., Avena *and the World Court's Death Penalty Jurisdiction in Texas*, 23 YALE L. & POL'Y REV. 455, 493 (2005) (stating that *Avena*, by itself, is not precedental in United States courts); Discussion, Meddelin v. Dretke: *Federalism and International Law*, 43 COLUM. J. TRANSNAT'L L. 667, 690, 701 (2005) (comments of Professor Curtis Bradley to same effect). The most that can be said is that the decision is persuasive authority concerning how the treaty should be interpreted in future cases not involving the same parties. *See id.* at 693 (comments of Professor Fisler Damrosch that *Avena* should be given "considerable deference"). Consequently, domestic courts have repeatedly held that they continue to be bound by their pre-*Avena* precedent interpreting the Vienna Convention. *See, e.g., Medellin v. Dretke,* 371 F.3d 270, 280 (5th Cir. 2004) (holding that its pre-*Avena* panel decisions holding that Vienna Convention does not create an individually enforceable right remain binding absent rehearing en banc); *Diaz v. Van Norman*, 351 F. Supp. 2d 679 (E.D. Mich. 2005) (holding that despite *Avena*, it was bound by *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001) (holding that Vienna Convention does not create individually

enforceable rights)).

The Second Circuit held in *United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001), that in light of the strong presumption against inferring individual rights from international treaties, the Vienna Convention does not create individually enforceable rights.[8]  *De La Pava* is clearly contrary to the I.C.J.'s opinion in *Avena*, but this Court remains bound by it in the absence of intervening Second Circuit or Supreme Court authority.[9]

Finally, it is not even clear that Hall could bring his claim in the I.C.J.  The Optional Protocol to the Vienna Convention provides that "[d]isputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice."  The United States was a party to the Optional Protocol, but on March 7, 2005, the President notified the

---

[8] The treaty contains conflicting language concerning whether the rights it creates are individually enforceable.  The Preamble to the Treaty states that the purpose of the privileges and immunities guaranteed by the treaty "is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." *United States v. Ortiz*, 315 F.3d 873, 885 (8th Cir. 2002) (quoting 21 U.S.T. at 79).  But Article 36(1)(b) requires the detaining nation to inform the detainee "without delay of *his* rights under this subparagraph." (emphasis added).

[9] Hall cites a concurring opinion in an Oklahoma Court of Criminal Appeals Decision, *Torres v. State of Oklahoma*, 04-442 (Okla. Crim. App. May. 13 2004) (Chapel, J., specially concurring), applying the reasoning of *Avena.*  Torres was, however, a party to the *Avena* decision.  *See id.*  The Oklahoma court was therefore merely enforcing a foreign judgment to which Torres was a party.  It did not treat the decision as binding precedent.  Enforcing a judgment is far removed from delegating authority to a foreign tribunal to state, for the purposes of all Article III courts, what the law is.  Weisburd, 96 AM. SOC'Y INT. LAW PROCEEDINGS at 43-44.

Secretary-General of the United Nations that the United States had withdrawn from that portion of the treaty. In *Medellin v. Dretke*, the Supreme Court was prepared to address the impact of this withdrawal on the rights of those prisoners who had been a party to the *Avena* decision.

<u>Remedy</u>

Even were this Court not bound by prior Second Circuit authority, American courts have held with near unanimity that suppression is not an appropriate remedy for a violation of the Vienna Convention, assuming it creates an individual right. *See United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001); *United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir. 2000) (en banc); *United States v. Li*, 206 F.3d 56, 60, 62 (1st Cir. 2000) (en banc); *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 622 (7th Cir. 2000); *United States v. Umbacia*, 2005 WL 1424821 (M.D.Fla. June 17, 2001); *Garcia v. State*, 17 P.3d 994 (Nev. 2001); *State v. Quintero*, 2005 WL 941004 (Tenn. Crim. App. Apr. 22, 2005). Hall contends that this precedent is no longer viable in light of the I.C.J.'s ruling because "a court order was violated." (Defendant's Brief 6.) But, as noted, *Avena* is only binding between the parties to that decision, which does not include Hall.

<u>Prejudice</u>

Nearly all courts have held, assuming that suppression is an appropriate remedy for a violation of the treaty, the defendant

must establish prejudice. For example, the Eighth Circuit has held that the defendant must prove that he would not have made the incriminating statement had the Consulate been notified. *Ortiz*, 315 F.3d at 886; *see also United States v. Cordoba-Mosquera,* 212 F.3d 1194, 1196 (5th Cir. 2000) (even assuming that suppression was available as a remedy, defendant must prove some form of prejudice). Hall had been informed of his right to remain silent and have an attorney present during question on several occasions. Nowhere does Hall state that had the consulate been notified, he would not have confessed. Nor does he provide any evidence of what the consulate would have done to prevent his confession.

<u>Conclusion</u>

For the foregoing reasons, the defendant's motions to suppress evidence seized during the course of his arrest and his post-arrest statements are denied.

The Clerk is directed to furnish a filed copy of the within to all parties.


SO ORDERED.

Dated :    Brooklyn, New York

           August 17 , 2005


                    <u>/s/Charles P. Sifton (electronically signed)</u>
                    United States District Judge